**HICKORY SPRINGS MANUFACTURING COMPANY and Factory Mutual Insurance Company, Plaintiffs**

v.

**STAR PIPE PRODUCTS, LTD., Defendant.**

No. 1:12CV161–M–S.

United States District Court, N.D. Mississippi, Eastern Division.

Jan. 14, 2014.

Jefferson C. Orr, Kenneth S. Schrupp, Smith Cashion & Orr PLC, Nashville, TN, Thad James Mueller, Law Offices of Thad J. Mueller, P.A., New Albany, MS, for Plaintiffs.

Gaines Spencer Beard, Jr., Michael F. Myers, Currie, Johnson, Griffin, Gaines & Myers, Jackson, MS, for Defendant.

## *ORDER*

MICHAEL P. MILLS, Chief Judge.

This cause comes before the court on the motion of defendant Star Pipe Products, Ltd. ("Star Pipe") for summary judgment, pursuant to Fed.R.Civ.P. 56. Plaintiffs Hickory Springs Manufacturing Company ("Hickory Springs") and Factory Mutual Insurance Company have responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, concludes that the motion should be granted in part and denied in part.

This products liability action arises out of over $800,000 in water damage which was allegedly sustained by plaintiff Hickory Springs as a result of burst water lines at its Verona, Mississippi facility. Approximately two hours after the plant closed on August 3, 2011, one of the buildings was flooded by around a foot of water from the sprinkler system when an 8 inch diameter metal "end cap," which had been installed approximately twelve years earlier, came off the end of a water pipe permanently installed in the ceiling. The piping in question, including an allegedly defective metal coupling attached to it, were manufactured by defendant Star Pipe, which is in the business of designing, manufacturing, and distributing parts for water and wastewater systems. Plaintiffs allege, *inter alia,* that the metal coupling in question was defectively manufactured, inasmuch as it did not form a proper geometric circle, thereby leading to the failure of the end cap which it held in place.

Plaintiffs filed the instant action based on diversity jurisdiction, and defendant has presently moved for summary judgment, contending that no genuine issue of fact exists regarding its potential liability and that it is entitled to judgment as a matter of law. The summary judgment issues in this case are significantly narrowed by the fact that plaintiffs have conceded defendant's motion as it relates to their breach of implied warranty claims, which leaves two remaining claims for the court's considerations: plaintiffs' manufacturing defect claim under the MPLA and their common law negligence claim. The court finds that plaintiffs have sufficient proof to survive summary judgment as to the former, but not the latter, claim. In so finding, the court notes that, under the MPLA, as under the common law, manufacturing defect claims involve an analysis more akin to genuine strict liability than the quasi-negligence analysis which applies to design defect cases.

██ Manufacturing defect claims are referred to as "deviation" defect claims under the MPLA, and this characterization is apt, since manufacturing defect claims involve allegations not that the entire product line in question was defectively designed, but rather that the specific product purchased by the consumer was manufactured in a way which deviated from the design specifications. In cases where a plaintiff can demonstrate that such a deviation exists, his burden of proof is lessened significantly as compared to design defect cases. The court finds that plaintiffs have submitted sufficient proof to establish fact issues regarding whether such a "deviation" existed in this case. In their brief, plaintiffs summarize their proof in this regard as follows:

> Richard Edwards, the engineer hired by the Plaintiffs, has identified a manufacturing defect in the Coupling, which he opines to be the sole proximate cause of the incident in question. Specifically, Mr. Edwards has identified a dimensional discrepancy/distortion in the C–4 Rigid Coupling at issue in this case. Derek Nolen, the engineer retained by Defendant Star Pipe, confirms that the Cou-

pling in question has the dimensional discrepancy noted by Mr. Edwards. Although the Parties' respective expert witnesses disagree on when and how the Coupling acquired that dimensional discrepancy, Mr. Edwards has adamantly testified that the Coupling's dimensional discrepancy was the result of faulty manufacturing.

In responding to these allegations, defendant summarizes its position as follows:

The Defendant agrees that since the event in question, the "circle" created by the coupling halves is slightly larger across some diameters but believes that the high pressure which forced the end cap through the coupling altered the coupling and caused or contributed to the dimensional disparity. There is significant physical and circumstantial evidence indicating that the coupling was not installed pursuant to specifications, specifically that the two coupling halves were not completely bolted together.

It thus appears that the parties agree that the coupling presently demonstrates a "deviation" from Star Pipe's design, although defendant submits that this deviation arose as a result of faulty installation by a third party rather than from any manufacturing defects on its part. In addition, defendant correctly notes that it is insufficient under the MPLA for the plaintiffs to demonstrate a "deviation" in the product at issue and that, to recover, they will also be required to demonstrate that the product was rendered unreasonably dangerous as a result.

While a jury will ultimately decide the merit of plaintiffs' manufacturing defect claims, it strikes this court that plaintiffs' expert testimony regarding the deviation which, he alleges, resulted from a manufacturing defect in this case, considered in the context of the apparent product failure and resulting damage, is sufficient to establish triable issues in this regard. Indeed, in seeking summary judgment as to plaintiffs' manufacturing defect claim, defendant relies largely upon an argument of law which, for the reasons discussed below, the court finds to be unpersuasive.

■ In arguing that plaintiffs' manufacturing defect claims are meritless as a matter of law, defendant relies upon two Mississippi Supreme Court decisions which held that an "improvement to real property" is not a "product," and therefore, "an action based on strict products liability will not lie." *Moore v. Jesco, Inc.*, 531 So.2d 815, 817 (Miss.1988); *Ferrell v. River City Roofing, Inc.*, 912 So.2d 448, 457 (Miss. 2005). Defendant submits that a sprinkler system and its components constitute an "improvement to real property" and that, under *Moore* and *River City Roofing*, they are not the proper subject of a strict products liability action. Specifically, defendant argues as follows in its brief:

As discussed herein, the Star Pipe components were installed as part of the permanent fire suppression system, mounted overhead in the factory, during a facility expansion in 1999. As components of the permanent fire-suppression system, they are an improvement to real property, and therefore are not a "product." As a matter of law "an action based on strict products liability will not lie" where, as here, the parts in question are an "improvement to real property." (citing *Moore* and *Ferrell*). In addition, it has been specifically held that a fire-suppression system is an "improvement to real property." ... Therefore, summary judgment in favor of Star Pipe on Plaintiffs' strict liability claims is required.

For its part, this court finds *Moore* and *River City Roofing* to be distinguishable, based on the fact that neither case involved a defendant, such as Star Pipe,

which was chiefly in the business of manufacturing the allegedly defective product in question.

In *Moore,* the defendant was described by the Supreme Court as being a "chicken house designer and construction company," 531 So.2d at 815, while, in *River City Roofing,* the defendant was described as being a "roofing company." 912´So.2d at 448. Admittedly, the Supreme Court used broad language in *Moore* and *River City Roofing* which at least arguably applies to products manufactured by any defendant which happen to find their way into "improvements to real property." Establishing different standards of liability for manufacturers based upon whether or not their products happened to end up attached to an improvement to real property would not seem to make a great deal of sense to this court, but it might be *Erie*-bound to apply such a holding if it concluded that the Mississippi Supreme Court intended for such a rule of law to apply. As it happens, another Mississippi Supreme Court decision decided subsequent to *Moore* strongly suggests that such is not the case.

In *McIntyre v. Farrel Corporation,* 680 So.2d 858 (Miss.1996), the Supreme Court, answering a certified question from the Fifth Circuit, made it clear, in the strongest possible language, that it did not intend for manufacturers of products to be subject to differing standards of liability based upon whether or not their products become attached to real property. The Supreme Court was very clear on this point in *McIntyre,* writing that:

> In the view of this Court, the Legislature could not have intended to create an irrational dichotomy between those manufacturers whose products are used as improvements to real estate and those who are not. Such a distinction would serve not only to set differing standards of liability for different prod-

ucts, but also to establish differing standards of liability for identical products based solely upon how they are used by the customer. For example, a manufacturer of a crane would presumably be granted repose protection for a crane which was bolted down and integrated with other machinery at a loading port, but would receive no protection for a crane which was used by a construction company at a variety of locations. Such an arbitrary result can not have been the Legislature's intent in passing § 15–1–41.

*McIntyre,* 680 So.2d at 865. The court finds no ambiguity in this language.

Defendant argues that *McIntyre* is distinguishable since it involved the question of whether the statute of repose set forth in § 15–1–41 should apply to manufacturers, but the court finds this to be a distinction without a difference. The Supreme Court in *McIntyre* did not merely frame its holding in terms of the statute of repose, instead making it clear, in very broad terms, that manufacturers should not face differing *standards of liability* based upon whether or not their products become attached to real property. Indeed, the Supreme Court in *McIntyre* wrote that "[b]asing liability or a lack thereof on the extent to which a product is attached to real property is so arbitrary as to shock the conscience." *Id.* at 864. This language goes far beyond the statute of repose, and the fact that this case involves the basic duty owed by defendant, rather than the limitations issues which were present in *McIntyre,* makes no difference that this court can discern.

The court finds one passage in *McIntyre* in particular to unequivocally defeat defendant's arguments on this issue:

> An interpretation of § 11–1–63 in the manner urged by Farrel would in effect serve as a signal to manufacturers that

they need exercise a lesser degree of care with regard to products which will be used as improvements to real property than with regard to other products. The manufacturer of gas or water pipes which are placed in buildings, for example, could specifically manufacture the pipes using cheaper materials which are designed to last a minimum of six years, knowing that it would face a lesser degree of liability or even no liability if said pipes leaked and caused injury to third parties more than six years after the pipes were installed.

*Id.* at 865. The Supreme Court in *McIntyre* thus specifically used the example of a manufacturer of "water pipes" as being the sort of defendant that should *not* face a lesser degree of liability in cases where its water pipes become attached to real property (as they generally are). This is fatal to defendant's arguments in this case, which involve the alleged failure of water pipes in a sprinkler system. In addition, the Supreme Court framed its analysis in *McIntyre* in terms of the "degree of care" owed by defendant, and whether the defendant in this case will be subjected to the same duty of care as owed by manufacturers of more mobile products is precisely the issue before this court now.

The public policy considerations against establishing differing duties of care in this context are clearly demonstrated by the facts of this case. In this case, defendant specifically argues that "sprinkler systems" are improvements to real property which should not be subject to strict products liability law. It should be undisputed that the primary purpose of a sprinkler system is to protect human beings against death by fire. On what conceivable basis might manufacturers of this, of all products, be subjected to a less exacting duty of care than that faced by manufacturers of more mobile products? None that this court can discern. The Supreme Court in

*McIntyre* made it clear that it would be "so arbitrary as to shock the conscience" to "base liability or a lack thereof on the extent to which a product is attached to real property," and this case clearly presents one of the clearest conceivable illustrations of this fact.

In arguing to the contrary, defendant notes that a federal district judge in the Southern District of Mississippi duly applied *Moore* in a 1995 decision, even though that judge made it clear in a footnote that he found the holding to be quite suspect. In *Wolfe v. Dal–Tile Corp.,* 876 F.Supp. 116 (S.D.Miss.1995), Judge Pickering applied *Moore* to bar strict liability claims against a supplier of floor tiles which appeared to be involved in the manufacturing process, but he included a footnote which was critical of the *Moore* decision. Specifically, Judge Pickering wrote that:

> In [*Moore* ], the Mississippi Supreme Court completely departed from a well-established line of cases in this state which provide that strict products liability actions may be maintained against "a manufacturer of a product and to a contractor who builds and sells a house with the product in it." *See State Stove Manufacturing Co. v. Hodges,* 189 So.2d 113, 118 (Miss.1966). This holding was not necessary to the disposition of the *Moore* case, since that case was clearly barred by the statute of repose and this Court doubts that the Supreme Court intended to depart from *State Stove* and the long established line of cases which followed it. However, the statement made by the *Moore* court that strict products liability actions could not be maintained in cases involving "improvements to real property" as opposed to products was clearly the holding of the case and not dictum. In the opinion of this Court the fallacy of that decision is

that material sold can be both "a product" and "an improvement to real property." It does not logically follow that either term is exclusive of the other. If this Court had the authority to certify this question to the Mississippi Supreme Court, it would. However, this Court lacks that authority and is mindful that the concept cited previously in this Opinion regarding deference to the plain language of a statute is equally applicable to the issue at hand. That is, it is not for this Court to wonder "why" when faced with the plain language of an Opinion from the Mississippi Supreme Court on an issue of Mississippi law. *Wolfe*, 876 F.Supp. at 121, n. 5. Judge Pickering thus correctly noted that the holding in *Moore* is in apparent conflict with *State Stove*, the seminal strict products liability case in this state's jurisprudence. Indeed, *State Stove* involved the explosion of a home hot water heater which had, by all appearances, become attached to real property. Far from negating the applicability of the strict products liability doctrine, the Supreme Court in *State Stove* found that the fact pattern in that case called for the recognition of the doctrine in this state.

This court agrees with much of Judge Pickering's analysis in *Wolfe*, and the differing result which he reached in that case is easily explained by one fact: *Wolfe* was decided one year prior to the clarification of these issues by the Supreme Court in *McIntyre*. If this court did not have the benefit of *McIntyre*, then it might be forced to throw up its hands and apply the arbitrary distinction which defendant urges in this case. As it stands, however, this court does have the benefit of *McIntyre*, which not only criticized this arbitrariness in the strongest possible language but also clarified that its analysis applied to manufacturers of "water pipes" such as Star Pipe.

Defendant argues that the Supreme Court's 2005 decision in *River City Roofing* constitutes a post-*McIntyre* re-affirmance of *Moore*, but, to reiterate, the defendant in *River City Roofing* was a roofing company rather than a more traditional products liability defendant. The defendant in *River City Roofing* plainly played a large role in the installation of the roofing product in question, and this is a fact which the Supreme Court has held to be significant in this context. In the 2008 decision of *Winkel v. Windsor Windows and Doors*, 983 So.2d 1055, 1058 (Miss.2008), for example, the Supreme Court wrote as follows in re-affirming *McIntyre*:

> We reiterate that (the statute of repose) was not intended to apply to mere suppliers of standardized products, but only to the kinds of economic actors who perform acts of "individual expertise" akin to those commonly thought to be performed by architects and contractors-that is to say, to parties who render particularized services for the design and construction of particular improvements to particular pieces of real property.... We reaffirm the precepts discussed in the *McIntyre* opinion again today and find the evidence in this record does not demonstrate Windsor Windows either supplied windows designed specifically for the Winkels' home or furnished specific instructions for the windows' installation into the Winkels' home. On the contrary, the evidence in the record indicates the windows were mass-produced, and the instructions generally indicated how to install the windows into stucco homes in general.

983 So.2d at 1058.

In resolving issues in the related statute of repose context, the Supreme Court thus appears to place considerable weight upon

whether the defendant in question participated in the design and construction of the particular facility in question. The defendants in *Moore* and *River City Roofing* clearly did so, but defendant concedes in its brief that, in this case, "[t]he end cap, the rigid metal coupling which secured it to the pipe, and the sprinkler pipe to which they were both attached were all part of a 1999 plant expansion by Pearson Construction, which subcontracted the sprinkler construction to Tri State Sprinkler Corporation, located in Memphis." It thus seems clear that, in this case, other entities performed the design and construction of the specific improvement to real property and that Star Pipe merely engaged in its customary role of manufacturer of water piping and associated components. The court therefore concludes that the doctrine of strict products liability, as set forth in the MPLA, is fully applicable to defendant in this case. The court further finds that plaintiffs have sufficient proof of a product "deviation" in this case to allow their manufacturing defect claims to go to trial.

■ The court notes that, in its summary judgment brief, defendant contests whether it actually manufactured the coupling at issue in this case, arguing that foundries in Brazil actually performed this task based upon a Star Pipe design. In their responsive briefing, plaintiffs set forth in considerable detail the control which Star Pipe exercised over the manufacturing process in Brazil, and all parties agree that the "Star Pipe" name is present on the coupling in question. Plaintiffs thus argue that Star Pipe qualifies as a manufacturer in this case based upon the control which it exercised over the process or, alternatively, through the "apparent manufacturer" doctrine. Plaintiffs do appear to have substantial proof that Star Pipe exercised sufficient control to be con-

sidered the manufacturer of the coupling in question, and this court will most likely ask the jury to decide this issue in a specific interrogatory. It is not clear whether it will be necessary for the court to decide at trial whether the "apparent manufacturer" doctrine applies under Mississippi law, and it reserves judgment on this issue. At this juncture, however, the court concludes that defendant is not entitled to summary judgment based on any argument that it was not the manufacturer of the coupling at issue in this case. The court therefore concludes that triable jury issues exist regarding plaintiffs' manufacturing/deviation defect claims under the MPLA, and defendant's motion for summary judgment will therefore be denied as to this claim.

The sole remaining claim for the court's consideration is plaintiffs' common law negligence claim. This court initially notes that there is some doubt regarding whether such a claim even survives the enactment of the MPLA. Indeed, in the October 2011 decision of *Lawson v. Honeywell Intern., Inc.*, 75 So.3d 1024, 1030 (Miss.2011), the Supreme Court clarified the circumstances in which common law negligence claims could be brought in product cases, notwithstanding the enactment of the MPLA. Specifically, the Court held in *Lawson* that "the MPLA does not preclude common-law negligence claims against non-manufacturing designers who do not fall under the purview of the statute." *Id.* While this holding may appear to be a victory for plaintiffs, it must be emphasized that the holding is limited to *non-manufacturing* designers. In so limiting its holding, the Supreme Court in *Lawson* cited with apparent approval a 2009 federal district court opinion for the proposition that "the MPLA preclude[s] common-law negligence claims against a manufacturer." *Id., citing Jowers v. BOC Group, Inc.*, 2009 WL 995613, at *4

(S.D.Miss. April 14, 2009). There is therefore considerable doubt regarding whether a products liability claim based upon a common law negligence theory may even be asserted against a manufacturer, post-MPLA.

■ Even assuming that a common law negligence claim may be asserted against a manufacturer, it does not appear, at this juncture, that plaintiffs have sufficient proof to establish negligence on the part of Star Pipe based upon the alleged manufacturing defects in this case. Indeed, it is not clear to this court why plaintiffs would even wish to proceed under a common law negligence theory, given that this court has denied summary judgment as to their strict products liability claims. The strict products liability cause of action was adopted partly based upon a recognition that it would be impossible in many, if not most cases, for plaintiffs to demonstrate what took place in the process of manufacturing a particular product so as to prove negligence.

Once again, plaintiffs do appear to have some evidence that a "deviation" exists between the specific coupling at issue in this case and one which had been properly manufactured according to specifications. This being the case, plaintiffs are able to proceed under the MPLA's strict liability approach to manufacturing defects, but establishing negligence is a much more difficult task for them. At this juncture, this court tends to agree with defendant that plaintiffs have insufficient proof of negligence in the manufacturing of the product at issue to allow a common law negligence claim to go to the jury. The court will therefore, in all likelihood, only allow the jury to consider plaintiffs' manufacturing defect claims against defendant. The court will thus tentatively grant the motion to dismiss plaintiffs' common law negligence claims, although it reserves the right to revisit this ruling if plaintiffs should present unexpectedly strong proof in this regard at trial.

In light of the foregoing, it is ordered that defendant's motion for summary judgment is granted in part and denied in part.